**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

SIGITAS BRINKLYS &
AURELIJA CARUSO,

                              Plaintiffs,

v.                                                             Case No. 3:14-cv-1211-J-34MCR

JEH JOHNSON, Secretary, Department
of Homeland Security, et al.,

                              Defendants.
_____/

# O R D E R

**THIS CAUSE** is before the Court on (1) Defendants' Motion for Summary Judgment (Doc. 21; "Defendants' Motion"), filed on May 11, 2015; and (2) Plaintiff's [sic] Motion for Summary Judgment and Supporting Memorandum of Law (Doc. 22; "Plaintiffs' Motion"), also filed on May 11, 2015. Defendants—Jeh Johnson, Secretary of the Department of Homeland Security; Loretta Lynch,[1] United States Attorney General; Leon Rodriguez, Director of Citizenship and Immigration Services; and Juan Osuna, Director of the Executive Office of Immigration Review—filed Defendants' Opposition to Plaintiffs' Cross Motion for Summary[ ]Judgment (Doc. 26; "Defendants' Response") on June 25, 2015. Plaintiffs, Sigitas Brinklys and Aurelija Caruso, filed Plaintiffs' Response to Cross Motion for Summary Judgment (Doc. 27; "Plaintiffs' Response") on June 25, 2015. Accordingly, this matter is ripe for review.

_____

[1] Loretta Lynch was sworn in as United States Attorney General on April 27, 2015. Pursuant to Rule 25(d), Federal Rules of Civil Procedure, she was automatically substituted as a Defendant in this case in the place of former Attorney General Eric Holder.

I.      **Background**

On February 10, 2000, Plaintiff Aurelija Gotautiene (now Caruso)[2] and Raimondas

Kalinauskas, both natives and citizens of Lithuania, arrived in the United States and were

admitted in New York City as tourists. Administrative Record (Doc. 16; "Tr.") at 782, 864.

Aurelija married United States citizen Frank Caruso on February 21, 2003, Tr. 782, and

Kalinauskas married United States citizen Luzmaria Martinez on April 22, 2003, Tr. 881.

On May 19, 2003, Caruso filed form I-130, Petition for Alien Relative ("I-130 Petition"), on

Aurelija's behalf. Tr. 881. That same day, Martinez filed an I-130 Petition on Kalinauskas's

behalf. Tr. 881.

On August 22, 2007, before the United States Citizenship and Immigration Service

("USCIS") decided Caruso's I-130 Petition, Aurelija and Caruso divorced, automatically

terminating the petition. Tr. 792, 864. A little more than two months later, on November

2, 2007, Aurelija married Plaintiff Sigitas Brinklys. Tr. 782, 791. Brinklys filed an I-130

Petition on Aurelija's behalf on February 21, 2008, Tr. 782, and Aurelija filed form I-485,

Application to Register Permanent Residence or Adjust Status ("I-485 Application"), that

same day, see Doc. 1 ("Complaint") ¶ 17; Doc. 12 ("Answer") ¶ 17.

On May 23, 2011, USCIS issued a Notice of Intent to Deny Alien Relative Visa

Petition ("NOID") indicating that it intended to deny Brinklys's I-130 Petition. Tr. 1. The

NOID identified information that caused USCIS to "doubt the actual intentions of the

marriages used for applying for immigration benefits." Id. USCIS relied heavily on a July

---

[2] The record reflects that Plaintiff Aurelija Caruso was born Aurelija Liutkeviciute; married in 1988 and took the last name Stockiene; and remarried in 1994 and took the last name Gotautiene. Tr. 793, 795. Because she apparently now goes by Aurelija Caruso, see Doc. 1 at 1, the Court refers to her as Aurelija to avoid confusion when discussing her and her first U.S.-citizen husband Frank Caruso.

10, 2006, memorandum detailing an investigation of Aurelija and Caruso's marriage by a special agent for U.S. Immigration and Customs Enforcement ("ICE"). <u>See</u> Tr. 881–85.

In the memorandum, ICE described Aurelija and Kalinauskas's history of joint property ownership as follows: On September 25, 2001, Aurelija purchased a residence on Arapahoe Court in Naperville, Illinois. Tr. 3, 883. She refinanced the property on March 18, 2002, at which time she listed herself and Kalinauskas as primary buyers. Tr. 3, 883. On February 19, 2003—two days before her marriage to Caruso—Aurelija and Kalinauskas again refinanced the property, listing Kalinauskas as the primary buyer and Aurelija as secondary buyer. Tr. 3, 883. Later that year, on December 12, 2003, Aurelija and Kalinauskas purchased a residence on Isle Royal Circle in Plainfield, Illinois, as joint tenants. Tr. 3, 883. Property records listed the two as "husband and wife." Tr. 3, 883. On February 18, 2004, Aurelija sold the Arapahoe Court property. Tr. 3, 883.

The memorandum also reflected that on December 4, 2004, Caruso entered into a one-year lease at an apartment complex on Bluff Street in Carol Stream, Illinois. Tr. 3, 882–83, 911–15. On the lease, Caruso indicated that he was single; his only prior residence was his mother's house, where he lived from June 1994 to November 2004; and the only other expected tenant would be his son. Tr. 3, 912. The memorandum described a police report indicating that Caruso had been arrested on February 13, 2005,[3] for driving under the influence. Tr. 3, 882. At the time of the arrest, he listed the Bluff Street apartment as his current address. Tr. 3, 882.

---

[3] The NOID and USCIS Decision indicate that Caruso was arrested for a DUI on September 15, 2005. Tr. 3, 12. It appears that USCIS misread the memorandum, which stated that the ICE agent investigating Aurelija and Caruso's marriage received the report of the February 13, 2005, arrest on September 15, 2005. <u>See</u> Tr. 882. The BIA noted the error in its decision and found the error harmless. Tr. 26 n.4.

The ICE memorandum discussed a police report from February 24, 2005, describing Illinois state law enforcement's interactions with Aurelija and Kalinauskas during a criminal investigation at the Isle Royal Circle property. Tr. 2, 881. Officers interviewed and arrested Kalinauskas. Tr. 2, 882. They reported that, during the interview, Kalinauskas identified Aurelija as his girlfriend. Tr. 2, 882. The officers also interviewed Aurelija, who reportedly stated that she and Kalinauskas were "good friends"; that she had lived at that address with Kalinauskas since December 2003; that she was married to Caruso but did not live with him because he and Kalinauskas did not get along; that she had known Kalinauskas for about eight years; that they had been in the United States for four to five years; that she did "not contribute any money to anything regarding the household"; that Kalinauskas paid the mortgage, household bills, and payments on three vehicles at the residence; and that she and Kalinauskas were trying to become U.S. citizens. Tr. 2, 881–82.

The memorandum described Aurelija and Caruso's interview on Caruso's I-130 Petition at the Chicago USCIS office on September 13, 2005. Tr. 882. Both presented Illinois state identification reflecting their residence at the Isle Royal Circle property. Tr. 2, 882. Caruso's identification card had been issued three days earlier, on September 10, 2005. Tr. 2, 882. According to the memorandum, an ICE agent interviewed Caruso separately in the presence of his attorney. Tr. 2, 882. On advice of counsel, Caruso refused to answer any questions, and he and Aurelija left the office. Tr. 882.

The memorandum further stated that ICE agents interviewed Caruso's mother, Mary Ann Caruso, on September 16, 2005. Tr. 3, 882. The agents asked her whether Caruso was married, and she responded that he was not. Tr. 3, 882. When the agents

told her that he was in fact married, she responded that she was unaware of that fact. Tr. 3, 882. She said she saw Caruso on a weekly basis; that he lived with his son at the Bluff Street apartment; and that, prior to moving into that apartment, he lived with her. Tr. 3, 882. She recognized a photograph of Aurelija and explained that Aurelija was introduced to her as Caruso's girlfriend about two years earlier. Tr. 882. Mrs. Caruso believed Caruso had stopped dating her "a long time ago." Tr. 882. Mrs. Caruso also said that Caruso had never lived in Plainfield, Illinois. Tr. 882.

Additionally, the memorandum stated that an ICE agent interviewed Martinez, who stated that her marriage to Kalinauskas was a sham. Tr. 3, 883. She stated that Kalinauskas paid her about $1,700 to go through with the marriage and that they never lived together or consummated the marriage. Tr. 3, 883. She stated that, after she informed Kalinauskas that she would not attend Kalinauskas's interview with USCIS, Kalinauskas visited her at her workplace and told her that he would report their sham marriage to the police if she did not attend. Tr. 3, 883. She stated that, several days later, a woman who she later identified by photograph as Aurelija visited her at her workplace, identified herself as Kalinauskas's girlfriend, and asked Martinez to go to Kalinauskas's interview. Martinez stated that Aurelija began to cry and told Martinez that "she was messing up [Aurelija's] family life." Tr. 3, 883–84. Aurelija left after Martinez threatened to call the police. Tr.3, 883–84. Finally, Martinez stated that, several days after that encounter, she spoke with Aurelija on the telephone, and Aurelija offered to pay Martinez $5,000 or $10,000 to attend Kalinauskas's interview. Tr. 3, 884. Martinez still refused, and she did not hear from Aurelija again. Tr. 3, 884.

In the NOID, USCIS stated that the information described above "appears to make the paper evidence submitted in regards to [Caruso] and Aurelija[']s marriage moot and useless in their attempt to reflect the marital relationship." Tr. 3. The NOID further stated that Aurelija and Brinklys were interviewed in connection with Brinklys's I-130 Petition on July 17, 2008, and that Aurelija was informed of USCIS's suspicion that her marriage to Caruso was fraudulent. Tr. 3. In response, Aurelija denied that allegation and explained that Kalinauskas was actually her step-brother and that her mother had adopted him when he was a child. Tr. 3. USCIS rejected that explanation as inconsistent with Aurelija's reported statement to law enforcement that she had only known Kalinauskas for about eight years. Tr. 3.

USCIS also rejected additional evidence Aurelija submitted concerning her marriage to Caruso and her relationship with Kalinauskas. Tr. 3–5. It found her own statement and a letter from Caruso discussing the circumstances of their relationship to be "seriously lacking in any details," and it observed that Caruso's letter offered no means of contacting him to verify his statements. Tr. 4. USCIS rejected a letter from people claiming to have been neighbors of Aurelija's family in Lithuania, submitted in support of her assertion that Kalinauskas was her brother, because the letter provided no identifying documents or photographs, failed to state the neighbors' ages, how long they had been neighbors, or any other details concerning their relationship with Aurelija's family. Tr. 4. USCIS similarly rejected a letter from a man claiming to be a physician in Lithuania who said he saw Kalinauskas as a patient at a clinic where he worked from 1970 to 1985 and corroborated that Kalinauskas had been raised by Aurelija's mother. Tr. 4. USCIS rejected a purported custody order from Lithuania dated October 1, 1976, granting

Aurelija's parents custody of Kalinauskas. Tr. 5. USCIS observed that the order is one sentence, is not on any official letterhead, does not indicate the title of the person who signed the order, and failed to include details USCIS deemed crucial to a custody order. Tr. 5. Finally, USCIS rejected a letter from Aurelija's mother stating that she had adopted Kalinauskas. Tr. 5. It observed that her statement that she had lost touch with Kalinauskas was inconsistent with the fact that Kalinauskas had come to the United States with Aurelija and continuously lived with Aurelija at the same houses where Aurelija's mother had come to visit. Tr. 5.

Addressing Aurelija's marriage to Brinklys, USCIS noted deficiencies in many of the documents provided to establish a bona fide marriage. Specifically, it observed that a life-insurance document was "merely an application" that did not indicate whether a policy was actually obtained; statements from various joint bank accounts did not show much financial activity; of the three photographs of them that were submitted, one was dated January 2004, when Aurelija was still married to Caruso; and a receipt from a furniture store in Chicago listed a Palm Coast, Florida, address for Aurelija and Brinklys, included no delivery fee, and stated that the customer would pick up the items. Tr. 4. USCIS noted that Aurelija had used a receipt from the same store as evidence of the genuineness of her marriage to Caruso. Tr. 4.

USCIS also noted that Brinklys was reluctant and hesitant during his interview. Tr. 4. It observed that Brinklys had submitted an affidavit in support of Kalinauskas's attempt to gain immigration benefits; that he identified himself as Kalinauskas's cousin; that he was identified as Kalinauskas's boss and contact with the Florida Department of Corrections; and that Kalinauskas had used Brinklys's address for a criminal probation

period. Tr. 5. USCIS observed that Brinklys had failed to disclose a third marriage that had taken place in Poland. Tr. 5. It observed that, according to automobile and property records, Brinklys had used at least three addresses since his marriage to Aurelija—one in Savannah, Georgia; one in Palos Hills, Illinois; and one in Palm Coast, Florida. Tr. 5. Finally, USCIS observed that Aurelija and Brinklys had not provided any information describing how they maintain their lives and finances and keep in contact while Brinklys is away from home working as a truck driver. Tr. 5. Based on those concerns, USCIS indicated that it also doubted the validity of Aurelija and Brinklys's marriage. Tr. 3, 6. It gave Brinklys 30 days to respond to the concerns identified and cautioned that additional evidence would be "subject to verification as well as the possibility of an overseas verification of any foreign documents." Tr. 6.

On June 16, 2011, Brinklys responded to the NOID. Tr. 402. He submitted a bank statement to support that Aurelija and Caruso had lived together at the Arapahoe Court residence. Tr. 404, 428. He submitted additional bank statements, utility bills, and proof of automobile insurance to show that the two had lived together at the Isle Royal Circle. Tr. 404–05, 431–533. Brinklys explained that Caruso had obtained the identification listing the Isle Royal Circle address three days before the USCIS interview because his driver's license had been suspended for speeding, and he was informed that he needed current identification. Tr. 405. He stated that, contrary to the assertion in the NOID, Aurelija contends that she was not interviewed separately on September 13, 2005, that no one ever informed her that they suspected that her marriage to Caruso was fraudulent, and that only Caruso was interviewed because investigators wanted to determine whether he was involved with Kalinauskas's criminal activity. Tr. 405, 409. He also stated that utility

bills from the Arapahoe Court address were only in Aurelija's name because she had been living there before marrying Caruso and did not add him to the accounts. Tr. 407.

Brinklys explained that Aurelija and Kalinauskas bought the Isle Royal Circle residence together because Caruso could not qualify, as he had recently received a bankruptcy discharge. Tr. 407, 411, 569–71. He stated that Aurelija had "no knowledge" that she and Kalinauskas were listed on property records as "husband and wife" and that she never told anyone she was married to Kalinauskas. Tr. 412. Brinklys explained that Aurelija and Caruso lived at the house and that Kalinauskas had a room there but was not there often because he was a truck driver and had another residence in Naperville, Illinois. Tr. 407. Brinklys again asserted that Kalinauskas was Aurelija's brother by adoption and included many of the same documents referenced in the NOID to support that assertion. Tr. 407–08, 549–67.

Concerning Aurelija's and Kalinauskas's statements to the police during the February 24, 2005, investigation, Brinklys contended that Kalinauskas had actually told law enforcement that Aurelija was his "female friend." Tr. 408. He confirmed that Kalinauskas and Caruso did not get along because of Caruso's drinking and gambling problems and that the men had only met once. Tr. 408. He stated that Aurelija denied telling the police that she had only known Kalinauskas for eight years, claimed she misunderstood the question, and asserted that she had also told officers that Kalinauskas was her brother. Tr. 408, 413. He confirmed that Kalinauskas paid the mortgage and bills at the Isle Royal Circle residence but contended that Aurelija paid for groceries and transportation costs. Tr. 408. He asserted that Aurelija and Caruso had been trying to save money at the time. Tr. 408. Brinklys confirmed that Kalinauskas paid for a Ford, a

Dodge Ram, and a Mercedes found at the Isle Royal Circle residence on the date of the investigation but that Aurelija and Caruso also owned a 2005 Chrysler 300, a 1997 Ford Crown Victoria, and a 1995 Mercedes. Tr. 409. Brinklys also asserted that the fact that the I-130 Petitions were filed on behalf of Kalinauskas and Aurelija on the same day was "just a coincidence" and so was "irrelevant and immaterial." Tr. 409.

In his response to the NOID, Brinklys also provided several explanations for Mrs. Caruso's statements to the ICE agent. He explained that Mrs. Caruso "was never happy that [Caruso] didn't marry an Italian-American or American girl" and that she "was upset that Aurelija refused to bail her son out of jail" after his DUI arrest. Tr. 410. He explained that, after Aurelija and Caruso separated in December 2004, Caruso stayed at his mother's house temporarily "so as not to pay child support." Tr. 410. Finally, he explained that Mrs. Caruso had lied when she told the ICE agent about Caruso's residence history "to protect her son, as he had several issues with law enforcement." Tr. 410. In his appellate brief to the BIA, Brinklys offered still another explanation for Mrs. Caruso's statements: that Caruso never told his mother that he was married to Aurelija because she wanted him to marry an Italian-American woman. Tr. 110–11.

Brinklys provided explanations for Caruso's December 2004 lease of the Bluff Street apartment as well as his statements on the lease application. He explained that Caruso had rented the apartment during his separation from Aurelija with the hope that "this short time apart would clear their situation." Tr. 410. He pointed to the joint bank statements and utility bills as evidence that Aurelija and Caruso continued to maintain common finances, and he pointed to a hotel receipt from July 2005 as evidence of a trip that Aurelija and Caruso took together. Tr. 410, 535–40. Brinklys explained that Caruso

had listed only his mother's house as a prior residence because Caruso "had no credit and had never before signed a lease or purchased a home." Tr. 411. He asserted that Caruso listed his marital status as single because he and Aurelija were separated at the time. Tr. 411. With respect to Martinez, Brinklys stated that Aurelija denied ever meeting or speaking to her. Tr. 412.

As to Aurelija's Illinois driver's license not matching her claim that she lived in Palm Coast with Brinklys, Brinklys explained that Aurelija was forced to obtain an Illinois driver's license because she was unable to obtain a work permit, and Florida would not issue a driver's license without a work permit. Tr. 413–14, 742–50. Brinklys also addressed the issues USCIS had identified concerning the documents Brinklys had filed to show that his marriage to Aurelija was genuine. Brinklys explained that the life-insurance application listed an Illinois driver's license for Aurelija because she had been unable to obtain a Florida driver's license. Tr. 415. He stated that the joint account statements do not reflect much activity because he and Aurelija do not make much money, and their finances are "simple." Tr. 415, 420. He explained that one of the photographs of the two of them incorrectly shows a date of January 7, 2004, because Aurelija had not set the proper date on the camera. Tr. 415. He contended that they took the picture in April 2008. Tr. 415. To illustrate his point, he provided a picture from 2003 to show the difference in Aurelija's appearance. Tr. 415, 581, 583, 585, 587–90. To address the receipt from the Chicago furniture store, Brinklys explained that the furniture store at issue "caters to the Lithuanian community in Chicago and has good prices," and that he was able to deliver his own furniture while driving a truck during the course of his employment. Tr. 416.

Brinklys contended that he and Aurelija might have appeared hesitant during the USCIS interview because they "sometimes do not understand English as well as they want to" and wanted to ensure that they understood the questions. Tr. 416. He further asserted that the interviewer was "abusive and unprofessional." Tr. 416.

Brinklys argued that Aurelija's letter about her relationship with Caruso provided all of the requested information. Tr. 416, 592. He contended that both her letter and Caruso's letter supported their statements about their relationship. Tr. 416–17. Concerning the letter from purported neighbors in Lithuania, Brinklys explained that those were lifelong neighbors, that their names and addresses were listed, and that the letter is notarized. Tr. 417. He provided several photographs purportedly showing Aurelija and Kalinauskas together as children. Tr. 417, 594–98. As to the physician's letter, Brinklys asserted that he is "a good doctor and was Aurelija's father's brother." Tr. 417. He explained that Lithuanian law requires that all medical records be kept in perpetuity. Tr. 417. As to the simplicity of the 1976 custody order, Brinklys explained that during that time "the USSR was overburdened with orphans," so there were no investigations for child placement or significant formalities when granting custody. Tr. 418.

As to Brinklys's statement on an affidavit that he was Kalinauskas's "cousin," Brinklys explained that he and Kalinauskas were good friends and that "[i]n certain countries and cultures, close friends are often referred to as uncles, aunts, or by other familial designations." Tr. 418. He asserted that Aurelija was not aware of his undisclosed marriage when she helped complete the I-130 Petition and provided an affidavit to that effect. Tr. 419, 740. He stated that the Savannah, Georgia, address was actually his boss's address and that he stayed there initially when he was relocated to Savannah

before moving to a long-term motel. Tr. 419. And, he explained that the Palos Hills, Illinois, address is his sister's residence, which he occasionally uses for deliveries and business so he can pick things up there when in Chicago for work. Tr. 419.

Finally, Brinklys submitted additional documents to further support his claim that his marriage to Aurelija was genuine. Those documents included bank statements, utility bills, automobile and property records, and joint income-tax filings. Tr. 420–21, 600–704.

On November 7, 2011, USCIS issued a decision denying Brinklys's I-130 Petition based on its findings that (1) Aurelija had previously entered into a marriage with Caruso for the sole purpose of evading immigration laws, and (2) Brinklys had failed to provide sufficient evidence to establish by a preponderance of the evidence that his marriage to Aurelija was bona fide. Tr. 10–17 ("USCIS Decision"). The bulk of USCIS's discussion was taken from its NOID, but USCIS also explained its rejection of the additional arguments and evidence Brinklys had submitted. Specifically, the USCIS Decision stated that the bank statements offered to show the validity of Aurelija and Caruso's marriage were insufficient because they reflected almost no activity. Tr. 14. It explained that the additional bills carried little weight because the bills related to the Royal Isle Circle residence, and Aurelija had previously stated that Kalinauskas paid all of the expenses for that residence. Tr. 14. And it explained that there was no evidence that Aurelija and Caruso were saving money at the time, as Aurelija claimed. Tr. 14.

As to the explanation regarding Caruso's recently obtained identification, the USCIS Decision noted that Brinklys failed to provide any evidence substantiating the claim that Caruso's original license had been suspended. Tr. 15. Similarly, it noted that there was no objective evidence supporting the explanation for Caruso's December 2004

lease of the Bluff Street apartment, and that the explanations offered were "vague and inconsistent." Tr. 15.

The USCIS Decision observed that the only additional evidence provided to demonstrate that Caruso and Aurelija had lived together at the Arapahoe Court residence was a single bank statement with no activity and a beginning balance of $94. Tr. 15. It explained that the six photographs provided were not "strong objective evidence," and in any event, four showed their wedding day, one showed them lying on a bed, and the final one was in a restaurant. Tr. 15. It noted that none of the photographs reflected their day-to-day lives. Tr. 15. It observed that Brinklys did not present any actual evidence that Aurelija and Caruso jointly owned any vehicles. Tr. 15. The USCIS Decision also rejected the assertion that it was a mere coincidence that the Aurelija's and Kalinauskas's applications for adjustment of status were filed on the same date and were prepared by the same person. Tr. 15.

The USCIS Decision explained that Aurelija still failed to adequately explain why she had reported to law enforcement that she had known Kalinauskas for only eight years but later claimed that he was her adoptive brother. Tr. 15. It observed that Brinklys failed to address the previously identified issues with the letters from Aurelija's purported neighbors and the physician in Lithuania. Tr. 15. It further noted that the response to the NOID at one point referred to Kalinauskas and Aurelija as "good friend[s]." Tr. 15. And it observed that, despite being told of the deficiencies in Aurelija's and Caruso's letters, neither ever provided additional details or evidence. Tr. 15.

Turning to Brinklys's marriage to Aurelija, the USCIS Decision stated that Brinklys offered "no credible reasoning why" he failed to tell Aurelija about one of his prior

marriages. Tr. 15. It found that Aurelija's explanation for why she had an Illinois driver's license at a time when she claimed to be living in Florida was insufficient because the fact remained that she "was presenting herself as a resident of another state at the same time she presents herself as residing with" Brinklys in Florida. Tr. 15–16. Concerning the life-insurance application, the USCIS Decision noted that Brinklys still failed to provide any evidence that they ever submitted the application. It observed that none of the statements from the joint bank accounts showed any activity outside of Florida despite that Brinklys was frequently out of state on business. Tr. 16. Finally, it gave little weight to the property records based on Brinklys's prior assertion that "having joint property with someone does nothing more than indicate possible credit issues." Tr. 16.

Brinklys appealed the USCIS Decision to the Board of Immigration Appeals ("BIA") on January 5, 2012. Tr. 100–24. He provided a significant amount of new evidence with his briefs. See Tr. 118–19, 121 (listing documents submitted for the first time with appellate brief "as the result of new allegations raised for the first time in the denial notice"). On August 26, 2014, the BIA affirmed the USCIS Decision on both grounds. Tr. 24–27. In doing so, it highlighted some of the findings in the USCIS Decision relating to its discussion of Aurelija's marriage to Caruso. Specifically, the BIA focused on (1) the fact that Caruso had obtained his identification showing the Isle Royal Circle address three days before the USCIS interview; (2) Aurelija's and Kalinauskas's statements to law enforcement on February 24, 2005; (3) the property records relating to the Isle Royal Circle and Arapahoe Court properties; (4) Mrs. Caruso's statements during the interview with ICE agents; and (5) the evidence relating to Caruso's Bluff Street apartment lease. Tr. 25–26.

The BIA specifically rejected several of Brinklys's contentions. First, it rejected his assertion that the February 24, 2005, police report was unreliable because it recorded that Aurelija had stated both that she had known Kalinauskas since childhood and that they had been close friends for about eight years. Tr. 25. The BIA did not find those statements contradictory. Tr. 25. Further, it rejected Brinklys's assertion that Aurelija's poor English skills caused her to misspeak to law enforcement because there was no documentation of any such limitations in communication, either in the police report or through other evidence. Tr. 25. The BIA also rejected Brinklys's complaint that he was not provided with copies of police reports, the ICE report on the marriage-fraud investigation, or property records. Tr. 26. It observed that 8 C.F.R. § 103.2(b)(16)(i) required USCIS to advise Brinklys of the derogatory information but did not require it to provide actual documents. Tr. 26–27. The BIA rejected Brinklys's contention that USCIS would have denied Caruso's I-130 Petition in 2005 if it really believed that the marriage was fraudulent, observing that there was no requirement that the prior petition be denied on such grounds. Tr. 27. It discounted Brinklys's assertion that neither Aurelija nor Caruso had ever been informed that USCIS suspected that their marriage was fraudulent, explaining that Brinklys did not establish that USCIS was required to give such notice or that Aurelija had been prejudiced by the lack of notice. Tr. 27. In the end, the BIA also summarily affirmed the USCIS's determination that Brinklys had failed to establish that his marriage to Aurelija was bona fide. Tr. 27.

Plaintiffs filed this case on October 6, 2014. See Complaint. They seek a writ of mandamus compelling Defendants to properly adjudicate Brinklys's I-130 Petition and Aurelija's I-485 Application, or, alternatively, review of the BIA's decision under the

Administrative Procedure Act, 5. U.S.C. §§ 702, 706 ("APA"). Complaint ¶¶ 12, 37. They allege that USCIS failed and refused to fully disclose the derogatory information on which it based its adverse decision in accordance with 8 C.F.R. § 103.2(b)(16), thereby violating Brinklys's due-process rights. Id. ¶¶ 22–25. Additionally, they contend that USCIS's denial of the I-130 petition, and the BIA's affirmance of that decision, constituted a "legal wrong" within the meaning of the APA. Id. ¶ 31. And last, they assert that USCIS should not have denied Aurelija's I-485 Application at the same time it denied Brinklys's I-130 Petition because Brinklys's subsequent appeal of the denial of his petition precluded the USCIS Decision from being a "final decision" on which to base denial of the I-485 Application. Id. ¶¶ 33–34.

## II.   Standard of Review

Ordinarily, Rule 56, Federal Rules of Civil Procedure (Rule(s)), governs the Court's review of a motion for summary judgment. Under that standard, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a). However, "when a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal," and "[t]he 'entire case' on review is a question of law." Am. Bioscience, Inc. v. Thompson, 269 F.3d 1077, 1083 (D.C. Cir. 2001). Thus, in such a case, the standard in Rule 56 does not apply. CS-360, LLC v. U.S. Dep't of Veterans Affairs, 101 F. Supp. 3d 29, 32 (D.D.C. 2015). Rather, "[s]ummary judgment is the mechanism for deciding whether as a matter of law the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." Id. (internal alterations and quotation marks omitted).

The APA "sets forth the full extent of judicial authority to review executive agency action for procedural correctness." FCC v. Fox Television Stations, Inc., 556 U.S. 502, 513 (2009). Under the APA, a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[4] 5 U.S.C. § 706(2)(A). Notably, "[t]he arbitrary and capricious standard is exceedingly deferential." Defenders of Wildlife v. U.S. Dep't of Navy, 733 F.3d 1106, 1115 (11th Cir. 2013) (internal quotation marks omitted). A reviewing court's role is to "ensure that the agency came to a rational conclusion, not to conduct its own investigation and substitute its own judgment for the administrative agency's decision." Id. (internal quotation marks omitted). "In determining whether the agency acted arbitrarily and capriciously, [a court asks] whether the agency examined the relevant data and articulated a satisfactory explanation for its action." Black Warrior

---

[4] The APA also allows a reviewing court to set aside agency actions that are "unsupported by substantial evidence." 5 U.S.C. § 706(2)(E). However, that provision applies only to cases "subject to [5 U.S.C. §§ 556 and 557] or otherwise reviewed on the record of an agency hearing provided by statute." Id. It is unclear whether the "substantial evidence" standard applies to review of the particular agency action involved in this case (denial of a petition seeking to establish an alien as an immediate relative of a U.S. citizen for immigration purposes). Some courts have cited both the "arbitrary and capricious" and "substantial evidence" standards in this context. See, e.g., Diaz v. U.S. Citizenship & Immigration Servs., 499 F. App'x 853, 854 (11th Cir. 2012); Koffi v. Holder, 487 F. App'x 658, 659 (2d Cir. 2012). However, other courts have found that only the "arbitrary and capricious" standard applies, concluding that the "substantial evidence" standard articulated in § 706(2)(E) applies only when a hearing is required prior to a final agency action. See, e.g., Simko v. Bd. of Immigration Appeals, — F. Supp. 3d —, 2015 WL 9581731, at *4–5 (D. Conn. Dec. 30, 2015); Akinjiola v. Holder, No. ELH-12-2597, 2014 WL 641702, at *5–6 (D. Md. Feb. 14, 2014). Nevertheless, as those courts have observed, there is no difference in practice between the two standards as applied to an agency's findings of fact. Simko, 2015 WL 9581731, at *5 n.6; Akinjiola, 2014 WL 641702, at *5–6. Indeed, the D.C. Circuit has observed that "[w]hen the arbitrary or capricious standard is performing that function of assuring factual support, there is no substantive difference between what it requires and what would be required by the substantial evidence test, since it is impossible to conceive of a 'nonarbitrary' factual judgment supported only by evidence that is not substantial in the APA sense." Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Reserve Sys., 745 F.2d 677, 683–84 (D.C. Cir. 1984) (alteration in original). Because it appears that the "arbitrary and capricious" standard is more appropriate in this context, the Court will use that standard with the understanding that it would reach the same result under the "substantial evidence" standard.

Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs, 781 F.3d 1271, 1288 (11th Cir. 2015)

(internal quotation marks omitted). An agency's action may be arbitrary and capricious:

> where the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Defenders of Wildlife, 733 F.3d at 1115. A court "should 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" Black Warrior Riverkeeper, 781 F.3d at 1288. When reviewing the evidentiary basis for an agency's action, a court must uphold the agency's decision "unless the evidence not only supports a contrary conclusion, but compels it." Abdille v. Ashcroft, 242 F.3d 477, 483–84 (3d Cir. 2001); see also I.N.S. v. Elias-Zacarias, 502 U.S. 478, 481 & n.1 (1992) (finding agency's determination can be reversed as unsupported by substantial evidence "only if the evidence presented … was such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed").

## III.   Analysis

### A.   Legal Framework

The Immigration and Nationality Act, 8 U.S.C. §§ 1101–1537 ("INA"), establishes the process through which a United States citizen may bring an alien who is a close relative, such as a spouse, to reside lawfully in the United States. See 8 U.S.C. §§ 1151(b)(2)(A)(i), 1154. To do so, the United States citizen ("the petitioner") must file an I-130 Petition on the alien relative's behalf requesting that USCIS formally recognize the relationship and classify the alien ("the beneficiary") as an "immediate relative." 8 U.S.C. § 1154(a); 8 C.F.R. § 204.1(a)(1). The petitioner bears the burden of proving the

validity of the claimed relationship by a preponderance of the evidence. 8 C.F.R. §§ 204.1(f), 204.2(a)(2); Matter of Pazandeh, 19 I. & N. Dec. 884, 887 (BIA 1989). The INA prohibits USCIS from approving an I-130 Petition if the beneficiary has at any time entered into a marriage for the purpose of evading the immigration laws:

> Notwithstanding the provisions of subsection (b) of this section no petition shall be approved if (1) the alien has previously been accorded, or has sought to be accorded, an immediate relative or preference status as the spouse of a citizen of the United States or the spouse of an alien lawfully admitted for permanent residence, by reason of a marriage determined by the Attorney General to have been entered into for the purpose of evading the immigration laws, or (2) the Attorney General has determined that the alien has attempted or conspired to enter into a marriage for the purpose of evading the immigration laws.

8 U.S.C. § 1154(c); see Diaz v. U.S. Citizenship & Immigration Servs., 499 F. App'x 853, 856 (11th Cir. 2012) ("Even if the current marriage is unquestionably bona fide, the visa petition cannot be approved if the beneficiary has previously had an I-130 petition filed on his behalf that was based on a fraudulent marriage."). A district director of USCIS is tasked with determining whether there is "substantial and probative evidence" of such a fraudulent marriage. See 8 C.F.R. § 204.2(a)(1)(ii); Matter of Samsen, 15 I. & N. Dec. 28, 29 (BIA 1974). The prohibition applies regardless of whether the beneficiary actually received a benefit from the fraudulent marriage. 8 C.F.R. § 204.2(a)(1)(ii).

### B.    Mandamus Relief

As an initial matter, Plaintiffs titled their Complaint as a "Complaint for Issuance of Writ of Mandamus," and they requested a writ of mandamus compelling USCIS to "properly adjudicate" their petitions. Complaint ¶¶ 12, 36–38. Although Plaintiffs frame their Motion as being based solely on the APA, see Plaintiffs' Motion at 1, 4–5, 22, they continue to assert that the Court has jurisdiction over the case in part based on 28 U.S.C.

§ 1361, which grants subject-matter jurisdiction to district courts over cases "in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff," see Plaintiffs' Motion at 3. It therefore is unclear whether Plaintiffs continue to seek mandamus relief. Even if they did, they have entirely failed to assert a basis for that relief. They present no argument as to why mandamus relief would be appropriate. See generally id. That failure alone would be sufficient for the Court to treat Plaintiffs' request for mandamus relief as abandoned. See Perez v. U.S. Bureau of Citizenship and Immmigration Servs. (USCIS), 774 F.3d 960, 964 (11th Cir. 2014) (finding request for mandamus relief abandoned based on failure to challenge district court's denial on appeal); United States v. Ford, 270 F.3d 1346, 1347 (11th Cir. 2001) (citing the "well established rule … that issues and contentions not timely raised in the briefs are deemed abandoned").

Nevertheless, even if Plaintiffs have not abandoned their request for mandamus relief, they have not established that such relief is warranted. Mandamus is an extraordinary remedy available only upon a showing that the plaintiff has no other adequate remedy. Cash v. Barnhart, 327 F.3d 1252, 1258 (11th Cir. 2003). Typically, where a statute provides for administrative or judicial review of an agency's actions, mandamus relief is unavailable. See Lifestar Ambulance Serv., Inc. v. United States, 365 F.3d 1293, 1295 (11th Cir. 2004) (citing Roche v. Evaporated Milk Ass'n, 319 U.S. 21, 27–28 (1943)). Plaintiffs have not made—and cannot make—the required showing that no alternative avenue of relief is available to them.[5] They essentially seek no more than

---

[5] In the Complaint, Plaintiffs alleged that "mandamus is appropriate because there are no other remedies at law that would require the agency to act within its statutory mandate." Complaint ¶ 38. For the reasons discussed below, that contention fails. The APA requires a reviewing court to both "compel agency

an order requiring USCIS and the BIA to properly adjudicate Brinklys's petition. The APA provides an adequate mechanism for obtaining that relief. Indeed, the Eleventh Circuit Court of Appeals has held that mandamus is unavailable to a petitioner challenging an administrative decision under the INA. See, e.g., Hoever v. Dep't of Homeland Sec., — F. App'x —, 2016 WL 471398, at *2 (11th Cir. Feb. 8, 2016) (finding district court lacked jurisdiction over petition for writ of mandamus where plaintiff could pursue administrative appellate review of immigration judge's decision with the BIA and then judicial review in court of appeals); Serrano v. U.S. Attorney Gen., 655 F.3d 1260, 1263–64 (11th Cir. 2011) (finding district court properly dismissed request for mandamus relief where APA provided adequate remedy); see also Hollywood Mobile Estates, Ltd. v. Seminole Tribe of Fla., 641 F.3d 1259, 1268 (11th Cir. 2011) ("The availability of relief under the Administrative Procedure Act … forecloses a grant of a writ of mandamus."). As such, Defendants are entitled to summary judgment to the extent that Plaintiffs request a writ of mandamus.

## C.   Disclosure of Derogatory Information Under 8 C.F.R. § 103.2(b)(16)

Plaintiffs contend that USCIS did not adequately disclose the "derogatory information" on which it intended to rely in concluding that Aurelija's marriage to Caruso was fraudulent. See Plaintiffs' Motion at 5–12; Plaintiffs' Response at 2–6. They contend that they were entitled to the documents themselves and that USCIS never provided the documents but instead merely summarized their contents. Defendants respond that USCIS complied with the applicable regulations by providing a detailed summary of the derogatory information. Defendants' Response at 18–20.

---

action unlawfully withheld" and "hold unlawful and set aside" an action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(1), (2)(A).

Under 8 C.F.R. § 103.2(b)(16), "[a]n applicant or petitioner shall be permitted to inspect the record of the proceeding which constitutes the basis for the decision." Specific to Plaintiffs' claim, 8 C.F.R. § 103.2(b)(16)(i) provides:

> If the decision will be adverse to the applicant or petitioner and is based on derogatory information considered by the Service and of which the applicant or petitioner is unaware, he/she shall be advised of this fact and offered an opportunity to rebut the information and present information in his/her own behalf before the decision is rendered …. Any explanation, rebuttal, or information presented by or in behalf of the applicant or petitioner shall be included in the record of the proceeding.

"A determination of statutory eligibility shall be based only on information contained in the record of proceeding which is disclosed to the applicant or petitioner, except [to the extent information relied on is classified in the interest of national security]." 8 C.F.R. § 103.2(b)(16)(ii).

Contrary to Plaintiffs' assertions, § 103.2(b)(16) does not require USCIS to provide a petitioner with the original evidence underlying the derogatory information on which it intends to rely. "The plain language of § 103.2(b)(16)(i) requires that USCIS 'advise[ ]' the petitioners whose claims are about to be denied of the 'derogatory information' that forms the basis for the denial. … [I]t does not require USCIS to provide documentary evidence of the information, but only sufficient information to allow the petitioners to rebut the allegations." Mangwiro v. Johnson, 554 F. App'x 255, 261 (5th Cir. 2014); see also Diaz, 499 F. App'x at 856 (USCIS complied with § 103.2(b)(16)(i) by issuing NOID "that indicated that [the] petition would be denied based on the discrepancies at the interview, and specifically gave [the petitioner] the opportunity to provide rebuttal evidence and to explain the discrepancies"); Ogbolumani v. Napolitano, 557 F.3d 729, 735 (7th Cir. 2009)

(finding § 103.2(b)(16)(i) "does not require USCIS to provide, in painstaking detail, the evidence of fraud it finds").

Plaintiffs cite Ghafoori v. Napolitano, 713 F. Supp. 2d 871 (N.D. Cal. 2010), for the proposition that § 103.2(b)(16) requires USCIS to provide to a petitioner the documents on which an adverse report is based. Plaintiffs' Motion at 7–9. In Ghafoori, USCIS denied the plaintiff's petition to allow his child (the beneficiary)—who was in Pakistan at the time—to be granted asylum. Id. at 874. Because the petition required proof that the child was under the age of 21 at the time the plaintiff had applied for asylum for himself, and because he did not have the child's birth certificate or other similarly acceptable evidence of her age, USCIS required additional evidence, which the plaintiff provided. Id. USCIS approved the petition, but before issuing the visa, the U.S. embassy in Pakistan obtained a "bone-age assessment" of the child. Id. Based on x-rays, a doctor opined that the child was at least 25 years old at the time, which meant that she had been over the age of 21 when the plaintiff applied for asylum. Id. USCIS reopened the petition and issued a NOID citing the doctor's evaluation as derogatory information. Id. at 875. It provided the doctor's letter but not the x-rays underlying his opinion. Id.

The plaintiff alleged that USCIS failed to comply with § 103.2(b)(16)(ii) because it did not provide copies of the x-rays. Id. at 878. The court in Ghafoori observed that several courts had interpreted subsection (i) as imposing no requirement that USCIS provide copies of the actual evidence to a petitioner. Id. at 880. Nevertheless, it pointed out that the plaintiff alleged a violation of subsection (ii)—not subsection (i)—and concluded that subsection (ii) "imposes the unambiguous requirement that the information be disclosed

to the petitioner." Id. Based on that conclusion, the court determined that USCIS violated subsection (ii) in failing to provide the x-rays to the plaintiff. Id. at 881.

Ghafoori directly conflicts with the Seventh Circuit's decision in Ghaly v. I.N.S., 48 F.3d 1426 (7th Cir. 1995). In that case, the plaintiff asserted that the Immigration and Naturalization Service ("INS"), the predecessor to USCIS, violated § 103.2(b)(3)[6] because it did not provide the text of an adverse witness statement on which it intended to rely in revoking the plaintiff's visa petition. Id. at 1434. The INS argued that it had complied with subsection (i) because the notice of intent to revoke "summarized the contents of" the statement. Id. The plaintiff responded that, even if the INS complied with that portion of the regulation, subsection (ii) "requires that the document itself must be disclosed." Id. The court rejected the plaintiff's arguments, concluding that "[t]he regulations do not mandate that [the plaintiff] must be provided an opportunity to view each and every sworn statement. In this case, the INS provided a summary of the grounds sufficient in detail to explain its reasoning for the revocation." Id.

Although neither Ghafoori nor Ghaly is binding on this Court, the Court finds the reasoning in Ghaly to be more persuasive. First, this case is factually more similar to Ghaly than Ghafoori: as in this case, Ghaly involved an individual's statement, which the adjudicating agency summarized. Additionally, as previously noted, most courts have concluded that § 103.2(b)(16)(i) does not require USCIS to provide copies of derogatory evidence to a petitioner. The BIA has reached the same conclusion, albeit in unpublished

---

[6] On January 11, 1994, the INS amended § 103.2(b) by redesignating subsection (3) as subsection (16), where the provision at issue remains in the current regulation. See Changes in Processing Procedures for Certain Applications and Petitions for Immigration Benefits, 59 Fed. Reg. 1455-01, 1461 (Jan. 11, 1994). The regulatory language on which the court relied in Ghaly is identical to the language in the current version of the regulation. See Ghaly, 48 F.3d at 1434 (quoting § 103.2(b)(3)(i) and (ii)).

opinions. See, e.g., In re: Liedtke, No. A070 656 080, 2009 WL 5548116, at *2 (BIA Dec. 31, 2009) ("[T]he federal regulations at 8 C.F.R. § 103.2(b)(16)(i) only require that a petitioner be advised of the derogatory evidence of record; the regulations do not place upon USCIS a requirement that the actual documents be provided to a petitioner in order to comply with due process."); In re: Firmery, No. A75 419 573, 2006 WL 901430, at *2 (BIA Feb. 28, 2006) ("[O]ur reading of the regulations confirms that an alien must only be 'advised' of the derogatory information which will be 'disclosed' to her and that she then be given an opportunity to rebut the evidence once the DHS has indicated an intent to deny the applicaton. 8 C.F.R. §§ 103.2(b)(16)(i) and (ii)."). The result in Ghafoori as to the scope of subsection (ii) is irreconcilable with those cases and opinions.

Moreover, although the court in Ghafoori purportedly construed subsection (ii), its reasoning related more to subsection (i). The court stated:

> Divorcing the doctor's analysis from the medical records on which he relied creates an impossible burden for any petitioner attempting to rebut his conclusion. In the absence of the x-rays it interprets, the doctor's letter is unimpeachable; it allows for no second opinion, and therefore no meaningful rebuttal. The right to rebut that the regulations explicitly confer would be nullified.

Ghafoori, 713 F. Supp. 2d at 880. A petitioner's right to rebut derogatory information of which he is unaware derives from subsection (i), not subsection (ii), and the weight of authority supports that a petitioner's right to rebut such information is adequately safeguarded when USCIS advises the petitioner of the information, even if it does not provide the actual evidence to him. Thus, the Court is not persuaded by Ghafoori.

Plaintiffs also cite Matter of Estime, 19 I. & N. Dec. 450 (BIA 1987), for the proposition that "a petitioner must be given the specific information contained in a record

of proceedings that forms the basis of an intention to deny a visa petition."[7] Plaintiffs'

Motion at 6–7. An administrative decision is not binding on this Court. <u>See</u> 8 C.F.R.

§ 103.3(c) (providing that "precedent decisions" are "binding on all [USCIS] employees in

the administration of the [INA]"). Nevertheless, such decisions can be persuasive and are

generally entitled to deference. <u>See</u> <u>Decker v. Nw. Envtl. Def. Ctr.</u>, 133 S. Ct. 1326, 1337

(2013) (explaining that a court should defer to an agency's interpretation of its own

regulation "unless that interpretation is plainly erroneous or inconsistent with the

regulation" (internal quotation marks omitted)). Even assuming the Court should defer to

the BIA's interpretation of § 103.2(b)(16) in <u>Estime</u>, that opinion does not appear to

impose any greater disclosure requirement than the courts followed here have found. In

<u>Estime</u>, the BIA stated:

> [A] notice of intention to revoke must include a specific <u>statement</u> not only
> of the facts underlying the proposed action, but also of the supporting
> evidence …. Similarly, with respect to a decision to revoke, we ask whether
> the evidence of record at the time the decision was issued … warranted
> such a denial. Where a notice of intention to revoke is based on an
> <u>unsupported statement or unstated presumption</u>, or where the petitioner
> is unaware and has not been advised of derogatory evidence, revocation of
> the visa petition cannot be sustained.

<u>Estime</u>, 19 I. & N. Dec. at 452 (emphasis added). Here, the NOID included a specific

statement of the evidence on which the derogatory information was based (e.g., property

records, the police report, and witness interviews). Tr. 2–3. Furthermore, the USCIS

---

[7] The Court notes that the continued persuasive value of <u>Estime</u> is unclear. The BIA issued its opinion in that case on August 12, 1987. On July 11, 1988, the INS revised § 103.2(b). <u>See</u> Powers and Duties of Service Officers; Availability of Service Records; Immigration; Adjudication of Application or Petition, 53 Fed. Reg. 26034, 26035 (July 11, 1988). Among other changes, that amendment revised the language in § 103.2(b)(3) to replace the word "evidence" with the word "information" in most places. <u>Id.</u> Although the INS did not explain the reason for that change, the change in wording casts doubt on the continued viability of at least those portions of <u>Estime</u> that required a specific statement of the <u>evidence</u> (in addition to the facts drawn from the evidence) on which a notice relied and inclusion of all such <u>evidence</u> in the administrative record. The regulation now only requires USCIS to advise a petitioner of derogatory <u>information</u> and include all such <u>information</u> in the record.

Decision was based on the Fraud Investigation Report, which was "evidence of record at the time the decision was issued."[8] See Tr. 881–84. And finally, the NOID was not based on any "unsupported statement or unstated presumption"; as previously discussed, the NOID explained the basis for the factual allegations, and Plaintiffs have pointed to no unstated presumption on which USCIS relied. In short, Estime provides no support for the proposition that USCIS was obligated to provide copies of evidence underlying a report on which USCIS relied in reaching an adverse decision.[9]

For the foregoing reasons, the Court concludes that USCIS adequately disclosed the derogatory information in the NOID, in accordance with 8 C.F.R. § 103.2(b)(16).[10]

---

[8] Although Plaintiffs do not state when they received a copy of the Fraud Investigation Report, they suggest that they only recently received it. See Plaintiffs' Motion at 7, 10. Even if true, it does not follow that the report was not in the administrative record when USCIS issued its decision. Moreover, Plaintiffs make no effort to explain whether or when they requested the entire administrative record or when they received it, nor do they suggest when it should have been provided to them. See generally id. Indeed, they do not argue that the Fraud Investigation Report should have been disclosed sooner. Instead, they argue only that they should have received the documents underlying the report in addition to the report itself. See id. at 7–12.

[9] Plaintiffs speculate that the Choicepoint report might have included evidence corroborating Aurelija's statement that she and Caruso jointly maintained finances. See Plaintiffs' Motion at 11–12. They similarly speculate that the September 13, 2005, USCIS interview of Aurelija and Caruso referenced in the NOID might have produced testimony corroborating or undermining their assertion that their marriage was genuine. Plaintiffs' Motion at 12; Plaintiffs' Response at 4–5. But § 103.2(b)(16)(i) only requires USCIS to advise a petitioner of "derogatory information" on which it intends to base its decision and of which the petitioner is unaware, and § 103.2(b)(16)(ii) requires only that any decision be based on information disclosed to the petitioner. Neither provision requires USCIS to advise of or disclose information that is neither derogatory nor relied upon in its decision.

Moreover, Aurelija had previously provided a contrary account of the September 13, 2005, interview in responding to the NOID. Specifically, she asserted that she actually was not interviewed at all that day; that officials interviewed Caruso only about his connection to Kalinauskas; and that the officials never asked about the relationship between Aurelija and Caruso. Tr. 405, 409. Indeed, it appears that USCIS misread the discussion of the 2005 interview in the Fraud Investigation Report, which in fact tends to support Aurelija's assertion that she was not questioned individually. See Tr. 882 (stating that an ICE agent "interviewed Caruso separately from Gotautiene" but providing no indication that Aurelija was questioned separately or that she and Caruso were ever questioned together). It therefore is unclear why Plaintiffs now believe that any record of that interview would contain information regarding the relationship between Aurelija and Caruso.

[10] In the introduction to a different part of their motion, Plaintiffs contend that USCIS violated Brinklys's substantive due process rights in failing to comply with § 103.2(b)(16). See Plaintiffs' Motion at 12. Plaintiffs' bare assertion of a due-process violation, without more, is insufficient to raise a due-process claim. See Ogbolumani, 557 F.3d at 735 (rejecting plaintiffs' attempt to "essentially recast[ ] their arguments

## D.    Evaluation of the Record as a Whole

Plaintiffs also contend that the BIA violated Brinklys's due-process rights in failing to consider the administrative record as a whole. Plaintiffs' Motion at 12–20. Although they frame this argument as being based on a violation of substantive due process, they cite only the APA's "arbitrary and capricious" standard and <u>Defenders of Wildlife</u>. <u>See</u> Plaintiffs' Motion at 12–13. <u>Defenders of Wildlife</u>, in turn, also cites only the "arbitrary and capricious" standard and makes no mention of due process. <u>See</u> <u>Defenders of Wildlife</u>, 733 F.3d at 1114–15. Because Plaintiffs cite no authority to support an independent substantive-due-process claim against an administrative agency based on failure to consider the record before it as a whole, the Court concludes that they have failed to establish such a claim. <u>See</u> <u>Ogbolumani</u>, 557 F.3d at 735–36. Thus, the Court will turn to the question of whether the BIA acted arbitrarily and capriciously in considering the evidence in the record.[11]

Plaintiffs take issue with USCIS's rejection of the evidence they had submitted to rebut the derogatory information in the NOID. <u>See</u> Plaintiffs' Motion at 14–16. However,

---

under the [APA] as constitutional ones" because "arbitrary rulings do not necessarily infringe upon the right to due process"). In any event, they contend only that the <u>failure to comply with</u> § 103.2(b)(16) amounted to a due-process violation. Because the Court has concluded that USCIS complied with that regulation, there can be no due-process violation. <u>Cf.</u> <u>Opoku-Agyeman v. Perez</u>, 886 F. Supp. 2d 1143, 1149–50 (W.D. Mo. 2012) ("A due process argument will fail if a petitioner cannot show USCIS violated § 103.2.") (citing <u>Hassan v. Chertoff</u>, 593 F.3d 785, 789 (9th Cir. 2010) (finding no colorable constitutional claim where government complied with § 103.2)).

Additionally, in responding to Defendants' Motion, Plaintiffs question the government's assertion of privilege as to the police reports by analogizing to the "law enforcement" exemption under the Freedom of Information Act, 5 U.S.C. § 552(b)(7). <u>See</u> Plaintiffs' Response at 2–4. This analogy is unavailing. Because the Court has determined that the applicable regulations did not require USCIS to disclose the reports at all, its reasons for withholding them are irrelevant.

[11] Because Plaintiffs separately argue that the record evidence was insufficient to support the adverse decision, <u>see</u> Plaintiffs' Motion at 20–23, the Court construes this argument as being solely focused on whether Defendants ignored or inadequately considered evidence in the record. The Court will separately address the sufficiency of the evidence on which they relied in reaching the adverse decision.

the BIA provided its own reasoning for some parts of its decision and relied on USCIS's reasoning for other parts. See Tr. 24–27. When the BIA provides an independent analysis on review, a court reviews only the BIA's decision, except to the extent the BIA expressly adopts USCIS's reasoning. See Jiang v. U.S. Attorney Gen., 568 F.3d 1252, 1256 (11th Cir. 2009); Tolesa v. Holder, 353 F. App'x 815, 818 (4th Cir. 2009); Salazar-Paucar v. I.N.S., 281 F.3d 1069, 1073 (9th Cir. 2002); Armah-El-Aziz v. Zanotti, No. 1:15-cv-261 (JCC/MSN), 2015 WL 4394576, at *3 n.5 (E.D. Va. July 16, 2015); Opoku-Agyeman, 886 F. Supp. 2d at 1148. Thus, the Court must review the BIA's decision and considers the USCIS Decision only to the extent that the BIA relied on USCIS's reasoning.

It appears that the BIA relied on USCIS's reasons for rejecting Aurelija's explanations for her statements to law enforcement concerning her relationship to Kalinauskas. See Tr. 25 ("We agree with the Director that the petitioner's explanations for these events and statements [described in the February 24, 2005, police report] are unpersuasive."). The BIA and USCIS observed that Kalinauskas referred to Aurelija as his "girlfriend"; that Aurelija said she had known Kalinauskas for about eight years; and that Aurelija said she was married to Caruso but did not live with him. Tr. 11, 25. In response, Aurelija contended that Kalinauskas had actually told officers that Aurelija was his "female friend." Tr. 408. She also stated that she had told officers that she had known Kalinauskas since she was about eight years old, not that she had only known him for eight years. Tr. 109, 408. She stated that Kalinauskas was actually her brother. Tr. 108, 407–08. And she contended that she accurately reported that she did not live with Caruso because Caruso had temporarily moved out at the time while the two were separated. Tr.

109, 408. She presented three letters and a purported Lithuanian custody order to support her contention that Kalinauskas is her brother by adoption. Tr. 408, 553–67.

Far from ignoring evidence in the record, USCIS spent considerable time explaining why it gave little weight to the evidence and statements Plaintiffs presented concerning Aurelija's relationship with Kalinauskas. See Tr. 11–16. Plaintiffs contend that USCIS's wholesale rejection of the favorable evidence demonstrates an inherent bias against them and suggests that USCIS had prejudged the validity of the two relationships without giving Plaintiffs a meaningful opportunity to convince it otherwise. Plaintiffs' Motion at 13–16; Plaintiffs' Response at 8–10. But the Court cannot conclude based on the record before it that USCIS's consideration of the evidence was inadequate or one-sided. Rather, USCIS's decision reflects a deep skepticism of Aurelija's credibility based on significant evidence of marriage fraud—particularly as to the Caruso marriage—which caused it to require convincing evidence explaining the serious issues the evidence before it had raised. That it found Brinklys's subsequent explanation in responding to the NOID lacking does not demonstrate a failure to view the evidence as a whole, particularly when considering that, as discussed more fully infra, many of the proffered explanations were inconsistent, undocumented, and/or unverifiable. To the extent the BIA independently evaluated the evidence concerning whether Aurelija and Caruso lived together during their marriage, as they claimed, its discussion demonstrates that it considered and rejected Brinklys's arguments as either unpersuasive or unsupported.[12] See Tr. 25–27.

---

[12] To the extent Plaintiffs argue that the BIA and/or USCIS erred in failing to mention the appropriate standard when evaluating Aurelija's marriage to Caruso—whether the two "inten[ded to] establish[ ] a life together," see Plaintiffs' Motion at 16 (citing McLat v. Longo, 412 F. Supp. 1021, 1026 (D.V.I. 1976))—their argument is not well-taken. By highlighting the evidence suggesting that Aurelija and Caruso had never

The only specific pieces of evidence Plaintiffs claim USCIS and the BIA "completely ignored" are a "detailed timeline regarding all pertinent events" and "detailed affidavits" from Brinklys, Aurelija, and several friends and family. See Plaintiffs' Motion at 15 (citing Tr. 53–61, 125–40, 186–200, 208–18, 230–39, 244–45, 247–52, 254–56, 262–63, 267–68). But USCIS did not consider that evidence because it was not in the record at the time it rendered its decision. See Tr. 60–61, 140, 189, 195, 208, 232, 239, 245, 250, 255, 263, 268 (showing documents submitted after November 7, 2011). Although the evidence had been submitted before the BIA issued its decision, the BIA did not err in not considering it because it is not permitted to consider new evidence submitted for the first time on appeal. Part 8 C.F.R. § 1003.1(d)(3)(iv) provides:

> Except for taking administrative notice of commonly known facts such as current events or the contents of official documents, the [BIA] will not engage in factfinding in the course of deciding appeals. A party asserting that the [BIA] cannot properly resolve an appeal without further factfinding must file a motion to remand. If further factfinding is needed in a particular case, the [BIA] may remand the proceeding to the immigration judge or, as appropriate, [USCIS].

Consistent with this regulation, courts routinely reject claims based on evidence submitted for the first time to the BIA on appeal. See Aragoncillo v. Attorney Gen. of U.S., 508 F. App'x 147, 151 (3d Cir. 2013) ("Evidence of this attack was submitted for the first time on appeal, and the BIA correctly declined to consider it." (citing § 1003.1(d)(3)(iv)); Monroy-Perez v. Ashcroft, 103 F. App'x 174, 175 (9th Cir. 2004) (rejecting plaintiffs' due-process argument based on inability to present new evidence to the BIA because, under § 1003.1(d)(3)(iv), plaintiffs "could have filed a motion with the BIA during the pendency

---

lived together (as they had claimed) as well as the evidence of Aurelija's close relationship with Kalinauskas, the BIA and USCIS adequately considered Aurelija's and Caruso's intent in entering into the marriage and implicitly found that they never intended to establish a life together.

of their appeal requesting the Board to remand the proceedings … for consideration of new evidence"); <u>Akinjiola v. Holder</u>, No. ELH-12-2597, 2014 WL 641702, at *9 (D. Md. Feb. 14, 2014) ("[T]he BIA could not have properly considered [an affidavit that postdated USCIS's decision] because its review is limited to the record that USCIS considered." (citing § 1003.1(d)(3)(iv)). Had Brinklys wanted the BIA to consider that additional evidence on appeal, he could have filed a motion to remand rather than submit the evidence for the first time on appeal. Not having done so, he cannot be heard to quarrel with the BIA's failure to consider his post-USCIS-denial evidence.

For those reasons, the Court concludes that the BIA and USCIS adequately considered the administrative record as a whole.

### E. Sufficiency of the Evidence

Plaintiffs also contend that the evidence in the administrative record does not support the BIA and USCIS's findings.[13] A petitioner seeking to establish a marital relationship with an alien bears the burden of proving by a preponderance of the evidence that the relationship is bona fide. <u>Pazandeh</u>, 19 I. & N. Dec. at 887. Under 8 C.F.R. § 204.2(a)(1)(ii), USCIS is required to "deny a petition for immigrant visa classification filed on behalf of any alien for whom there is substantial and probative evidence of [an attempt or conspiracy to enter into a marriage for the purpose of evading the immigration laws], regardless of whether that alien received a benefit through the attempt or conspiracy." The Court therefore must determine whether the BIA (and USCIS, to the

---

[13] The parties frame this argument based on the "substantial evidence" standard. Plaintiffs' Motion at 20; Defendants' Motion at 19–22. As discussed <u>supra</u> at 18 n.4, the appropriate standard is whether the evidence was such that the BIA—and, to the extent it relied on the USCIS Decision, USCIS—acted arbitrarily or capriciously in reaching their decisions. In any event, as the Court observed, the "arbitrary and capricious" standard, when applied in the context of evaluating sufficiency of the evidence, is functionally equivalent to the "substantial evidence" standard.

extent the BIA relied on the USCIS Decision) acted arbitrarily or capriciously in determining that (1) substantial and probative evidence existed to support a conclusion that Aurelija had married Caruso for the purpose of obtaining immigration benefits; and (2) Brinklys failed to prove by a preponderance of the evidence that his marriage to Aurelija was bona fide.

The Court concludes that the BIA and USCIS did not act arbitrarily or capriciously in determining that substantial and probative evidence supported finding the Caruso marriage to be fraudulent. First, the record contains ample evidence undermining Aurelija's claim that she lived with Caruso during their marriage. Specifically, Aurelija only ever owned property jointly with Kalinauskas, including the Isle Royal Circle property that they owned as "husband and wife." Tr. 883. Caruso obtained an identification card with the purported marital address just three days before the September 13, 2005, USCIS interview. Tr. 882. Caruso's November 2004 lease application for the Bluff Street apartment indicated that he was single, had lived with his mother for the preceding 10 years, and intended to share the apartment with his son and no one else. Tr. 912. Upon his arrest on February 13, 2005, Caruso told law-enforcement officers that he resided at the Bluff Street apartment. Tr. 882. Mrs. Caruso told ICE agents in September 2005 that Caruso had lived with her immediately prior to moving in with his son at the Bluff Street apartment and that he had never lived in Plainfield, Illinois (where the Isle Royal Circle house was located). Tr. 882.

Brinklys attempted to rebut each of those facts. As to Aurelija's joint property ownership with Kalinauskas, he explained that Caruso had filed for bankruptcy in 2002 and so was unable to qualify for a mortgage with Aurelija, so she purchased the Isle Royal

Circle property with Kalinauskas. Tr. 407–08, 411. He stated that Aurelija was unaware that property records listed her and Kalinauskas as "husband and wife." Tr. 412. As to Caruso obtaining identification only a few days before the USCIS interview, Brinklys explained that Caruso learned that he would need current identification for the interview, and his driver's license was suspended at the time. Tr. 405. As to Caruso's statements on the lease application, Brinklys explained that Caruso accurately listed his marital status as "single" because he and Aurelija were separated at the time, and Caruso did not list any prior residence other than his mother's house because he had never rented or owned any property before moving to the Bluff Street apartment. Tr. 410–11. Brinklys stated that Caruso told police he lived at the Bluff Street apartment because he and Aurelija were separated at the time. Tr. 410. Finally, Brinklys offered several potential explanations for Mrs. Caruso's statements: (1) that Caruso never told her that he had married Aurelija because Mrs. Caruso had wanted him to marry and Italian-American or American woman; (2) that Mrs. Caruso was unhappy that Caruso had married Aurelija instead of an Italian-American or American woman and was angry with Aurelija for not bailing Caruso out of jail after his most recent DUI arrest; and (3) that Mrs. Caruso lied about Caruso's residence to protect him because he had had problems with the law in the past. Tr. 110–11, 410.

The BIA's finding that Aurelija and Caruso never lived together was not arbitrary or capricious. Most of Brinklys's rebuttal consisted of unsupported assertions. Although Brinklys offered evidence that Caruso had received a bankruptcy discharge, thus supporting the assertion that Caruso did not have sufficient credit to apply for a mortgage with Aurelija, the BIA reasonably noted that Brinklys offered no evidence to contest or

even explain the property records showing that Aurelija and Kalinauskas bought the Isle Royal Circle property as "husband and wife." Tr. 26. Moreover, Brinklys provided no evidence to substantiate that Caruso's license had been suspended. The BIA also noted that Caruso's statements on his lease application and to law enforcement were consistent with Mrs. Caruso's statements. Tr. 26. And Brinklys's attempts to explain Mrs. Caruso's statements were inconsistent and unsubstantiated. It is apparent from the BIA's decision that it found Mrs. Caruso credible. That she directly contradicted any assertion that Caruso had ever lived with Aurelija was more than sufficient to support the BIA's conclusion that Aurelija and Caruso never lived together and, more generally, that they lacked credibility.

In addition to the evidence indicating that Caruso and Aurelija had never lived together, the BIA relied on other evidence supporting a conclusion that their marriage was not genuine. Mrs. Caruso stated that she was unaware that Caruso was married at all and that she thought he and Aurelija had broken up much earlier. Tr. 26, 882. Kalinauskas told law enforcement that Aurelija was his girlfriend. Tr. 25, 882. And Aurelija told law enforcement that she had known Kalinauskas for only eight years. Tr. 11, 25. As discussed, Brinklys attempted to demonstrate that Aurelija and Kalinauskas did not have a romantic relationship but were actually siblings.

USCIS's reasons for rejecting Brinklys's evidence and assertions concerning the nature of Aurelija's relationship with Kalinauskas, which the BIA adopted, are not arbitrary or capricious. It rejected the letters from the neighbors and physician in Lithuania as unverifiable and lacking in detail. Tr. 4, 13–14. As to the neighbors' letter, although it was notarized (thus providing some verification of the identities of the signatories), it stated

nothing more than that they were Aurelija's family's neighbors and that they know Kalinauskas grew up with that family. Tr. 4, 14, 561. The letter provided the signatories' address but did not explain where they lived in relation to Aurelija's family. Tr. 4, 14, 561. The neighbors did not indicate how well they knew Aurelija's family or whether they interacted with them. See Tr. 561. And their letter provided no means for USCIS to follow up with them to fill in those details. See id. As to the physician's letter, USCIS expressed skepticism that a physician would remember a patient from at least 20 years earlier or that the clinic where he worked would have maintained patient records for that length of time. Tr. 4, 14. Brinklys explained that the physician was a relative of Aurelija's and that Lithuanian law requires medical facilities to retain medical records permanently, but he provided no evidence substantiating either of those claims. See Tr. 417. As to the letter from Aurelija's mother, USCIS questioned her general credibility by highlighting that her statement that she had lost touch with Kalinauskas was inconsistent with other evidence that Kalinauskas continuously lived with Aurelija when they moved to the United States, and that Aurelija's mother had been to their shared residence when she visited the United States. Tr. 5, 14. Finally, as to the purported custody order, USCIS observed that it was a single sentence, was not on letterhead, did not list the title of the person signing the order, and lacked any details typically associated with a custody order. Tr. 5, 14, 553. Brinklys responded that countries in the former Soviet Union during the 1970s were overburdened with orphaned children, so governments did not observe many formalities in granting custody of a child to a willing family. Tr. 418. Again, Brinklys provided no evidence to substantiate that assertion. Finally, the BIA rejected Brinklys's assertion that

Aurelija had poor English skills because that assertion was unsubstantiated.[14] Tr. 25. Although the photographs purportedly showing Aurelija and Kalinauskas together as children might have provided some support for their statements, it is unclear who provided the photographs or wrote the handwritten identifications on them. See Tr. 594–98.

In light of all of that evidence, the BIA did not act arbitrarily or capriciously in determining that there was substantial and probative evidence that Aurelija married Caruso for the purpose of evading immigration laws. Although the evidence of shared bank accounts and financial responsibilities might have weighed in favor of the validity of that marriage, neither that evidence nor any other evidence or explanation Brinklys provided compels a conclusion contrary to that reached by USCIS and the BIA.[15] Plaintiffs urge the Court to conclude that the evidence on which the BIA and USCIS relied simply shows a series of unfortunate coincidences that all have innocent explanations that the agency refused to consider. However, the record reflects that USCIS did not ignore evidence; it carefully reviewed it but found it unavailing. To that end, Defendants urge, and the BIA and USCIS found, that there was too much adverse evidence to be considered a coincidence, and Plaintiffs' attempts to explain away that evidence were insufficient. Even if the record, at worst, permitted two interpretations of the facts

---

[14] Notably, as to Kalinauskas's statement, Brinklys asserted only that the report was incorrect and that Kalinauskas had actually referred to Aurelija as his "female friend." Tr. 408. Setting aside the fact that that phrasing could still suggest a romantic relationship, Brinklys provided no evidence—such as an affidavit from Kalinauskas—supporting that that was what Kalinauskas actually said.

[15] USCIS rejected the evidence of joint expenses because most of the submitted documents concerned utilities and other services at the Isle Royal Circle address, and Aurelija had admitted that Kalinauskas actually paid all of the expenses associated with that property. Tr. 14. It also observed that Brinklys's explanation for Aurelija and Caruso's failure to pay any of the expenses at that address—that the two were saving money at the time—was unsubstantiated. Tr. 14. USCIS also discussed the significant evidence of Kalinauskas's own marriage fraud and the fact that the petitions for Aurelija and Kalinauskas were filed on the same day. Tr. 12–13. The BIA did not directly address that evidence, and it is unclear whether it adopted the USCIS Decision to the extent that USCIS discussed that evidence.

surrounding Aurelija's marriage to Caruso, the USCIS and BIA's determinations cannot be found to be arbitrary and capricious. Because the evidence in the record permitted the BIA and USCIS to reach the conclusion that Aurelija's marriage to Caruso was fraudulent, the Court must affirm that finding. In light of that determination, the Court need not address whether the BIA or USCIS acted arbitrarily or capriciously in determining that Brinklys had failed to meet his burden of proving the validity of his own marriage to Aurelija because, regardless of whether that marriage is genuine, the existence of a prior fraudulent marriage bars any subsequent visa petition on Aurelija's behalf. See Diaz, 499 F. App'x at 856; 8 U.S.C. § 1154(c); 8 C.F.R. § 204.2(a)(1)(ii).

## IV.    Conclusion

In light of the foregoing, Defendants' Motion is due to be granted, and Plaintiffs' Motion is due to be denied. Accordingly, it is hereby

ORDERED:

1.    Defendants' Motion for Summary Judgment (Doc. 21) is **GRANTED.**

2.    Plaintiff's [sic] Motion for Summary Judgment and Supporting Memorandum of Law (Doc. 22) is **DENIED.**

3.    The Clerk of the Court is directed to enter **JUDGMENT** in favor of Defendants and against Plaintiffs and close the file.

**DONE AND ORDERED** in Jacksonville, Florida, on March 30, 2016.

MARCIA MORALES HOWARD
United States District Judge

lc21

Copies to counsel of record